Here ye, here ye, this Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Liam C. Brennan, presiding. Good morning, you may be seated please. The 2nd case on the dock is sworn. Mr. Hudson, you may proceed. Good morning, your honors. Tim Hudson on behalf of Appellant Counter Appellee U.S. Property Investment Groups. U.S. property is a family business and its principles are Sandra and Bogdan Stanek who are joining us here today. May it please the court. This is a case about one of the most fundamental principles in Illinois law, that contracts should be enforced according to their plain and unambiguous terms. This is a breach of contract dispute involving the termination of a written driveway easement agreement between two adjacent private property landowners, U.S. Property and Symphony Way. Counsel, I'd like to ask, this contract wasn't entered into between the parties here. They were entered into by different people, were they not? In part, yes. The U.S. property is a subsequent owner of the adjacent land that it now owns. It acquired that in 2012. It was the prior owner of the property that entered into the easement agreement. That's correct. Okay. So, unless there was some very intimate conversations between the prior owner and your client, your clients wouldn't know what the intent of the contract was. Am I correct or not? No. You're correct in part, unless there were intimate conversations between the prior landowner. But the intent of the parties, the intent of the original parties to the contract, is defined by the plain and unambiguous language of the contract itself. In addition, there was testimony at the trial from the principal of Symphony Way, who was an original party to the contract, Ms. Linda Haight. She was with us. She was called as a witness. And she was also able to testify as to certain issues that did not touch on, of course, the unambiguous provisions of the contract, which themselves are the best evidence of the party's intent. Here, the relevant contract language is plain and unambiguous, and there is no meaningful dispute of the relevant underlying material facts. However, the circuit court erred in finding that the easement agreement had not been terminated. Following a bench trial, the circuit court added, deleted, and rewrote unambiguous provisions of the party's written contract in order to support an outcome that the circuit court deemed to be more equitable. The circuit court also erred in barring U.S. property from presenting evidence that Symphony's use of the easement agreement violated the Americans with Disabilities Act, which was a basis for one of the claims, the terminations brought by U.S. property. Finally, the circuit court erred in finding that a prescriptive easement existed, despite Symphony's admission that the use of the subject prescriptive easement was always permissive, not adverse. And the circuit court also finding that the contract itself permitted Symphony to cross U.S. property's parking lot in order to access the easement. Was there ever a time when the cutout was not the method used to access the easement? There was no evidence that there was ever any such time. I'd like to briefly address each of these topics in turn. The circuit court committed clear error in finding that the easement agreement had not been terminated, and it committed clear error in two significant ways. Paragraph 7a of the easement agreement unambiguously states that in the event of, quote, a breach of any of the provisions hereof, end quote, by Symphony that is not cured within seven days of receiving written notice, U.S. property, quote, shall have the right at its discretion, pardon me, at its election to terminate the rights of Symphony, end quote. By recording a declaration of termination with the Kane County recorder of deeds. Are you saying that the court erred in attaching the word materially to the word breach in interpreting the contract? Well, it erred in two ways. And yes, that is one of the errors. As Illinois law states that where there is an affirmative obligation under a contract, a failure to do that material obligation is a breach. Now, materiality can come into play, for instance, where a party is seeking to avoid its contractual obligations based on a prior material breach. It can come into play where we consider issues of damages. But the parties here, in a state that honors freedom of contract, chose not to say any material breach or a material breach. They chose to say any breach because all of the obligations set forth in this very short written contract, this short but important written contract, was meaningful to the parties. As evidenced by the fact that they included these obligations, including the insurance obligation, as a mandatory affirmative obligation. And here the record's clear that there was always insurance. It was this period of time where notice was not provided. Well, there was insurance on and off. There were also times where insurance had been, where U.S. property had received notice that the insurance had been canceled. And we received silence from the other side as to whether or not it had been reinstated. You've not alleged that as a breach. They didn't allege that as a breach in their complaint. That's correct, Your Honor. Okay. So that's not relevant. That's correct. Okay. But as a general matter, there was evidence that while insurance at various times was in place, that's not the only affirmative mandatory obligation. The contract is unambiguous and clear that not upon request shall proof of insurance be provided. But it is a mandatory obligation for Symphony Way to provide that proof of insurance for very good, very important reasons. The circuit court ignored this plain language and rewrote the termination provision's substantive scope and really effectively eliminated the termination provision entirely. Indeed, the circuit court's sole justification for rewriting the contract's termination provision was that it was supposedly, quote, in keeping with the appurtenant nature of the easement. You see, the circuit court concluded that an express easement appurtenant cannot be subject to a written termination provision. And that conclusion is completely unfounded and contrary to Illinois law. Indeed, in the 527 South Clinton case cited in our briefs, the Illinois Court of Appeals enforced a written termination provision in an express easement appurtenant. And as we explained in our briefs, the McCann case, the only case cited by the circuit court for this astonishing proposition, said absolutely nothing of the sort. Indeed, the McCann case did not even involve a written easement agreement, much less a written easement agreement that involved an express termination provision. It simply does not support the extraordinary proposition upon which the Court based its unfounded conclusion that an easement appurtenant cannot be terminated by private parties subject to a written agreement. In addition to rewriting the termination provision to require prior leave of court, the circuit court also rewrote the termination provision so that it no longer applied to any breach. Of course, the parties could have written in any material breach or a material breach, but that's not the deal they negotiated and reached. And the best evidence of their intent is the plain language of the contract. Any means any. Was there any terminology about full faith and fair dealing? No. So it wasn't in the contract and it doesn't apply? That full faith and fair dealing? If that clause or that terminology wasn't included, then it seems to me that your argument is that your clients don't have to do anything in good faith insofar as this particular issue or this easement was concerned. Justice McClaren, I wouldn't take it that far. Every contract in the State of Illinois implies a covenant of good faith and fair dealing. The U.S. property religiously adhered to its obligations to provide written notice to Symphony Way in this case. And they did so over a matter of years. There were literally dozens of letters that were sent that were identifying material breaches of the party's easement agreement. Time and time again, U.S. property was begging, pleading with Symphony to honor the contract, to just do what they promised to do in the contract. And indeed there was testimony in the case that frankly Symphony didn't take those concerns seriously until after the easement was terminated. Years into the party's relationship here. Give me an example or two, please. Well, the issue of insurance was one that had been discussed among the parties over a period of years. When U.S. property purchased the property, they contacted Symphony Way to let them know that we're the new owners of this property and to direct communications to them in connection with the easement agreement. There was no snare trap set. It was an open discussion and dialogue when there was storage of building materials in the easement. Are you talking about drywall or something else? Oh, it was drywall, it was boxes, it was saws and sawzalls as Symphony Way was remodeling its building. U.S. property didn't call the police and bring the police over to remove everything. They talked to the owners, they sent letters that said, hey, listen, your people are working on the easement, which is not what the limited easement agreement is expressly for. Can you move this equipment elsewhere? We don't want someone being hurt on our property here. So they sent written requests time and time again to have these matters addressed. And they simply weren't. They weren't cured. And even though they weren't cured, year after year after year, U.S. property could have terminated the easement on those various grounds, but they didn't. They wanted to be a good neighbor. They wanted to work together cooperatively. But ultimately, after around four or five years, Justice McLaren, enough was enough. Enough was enough. They had contract rights to protect, they had rights that they were entitled to exercise, and they did so on well-founded bases and in good faith. The second major error for the court here was that the court had to rewrite the language and reimagine the unambiguous language of the contract in order to make it clear that there had been no breach to trigger the termination rights. Importantly, the circuit court never found, never determined that the evidence failed to demonstrate a breach of the actual language of the contract. Instead, the circuit court again rewrote the plain terms of the contract in order to find that no breach occurred. Are you aware of any case law in Illinois that stands for the proposition that if a contract just speaks of breach versus the language of material breach, that material or materiality isn't nevertheless intended by the contract? Well, Your Honor, a case that I think is close to on point on, to directly on point on, is a case that I think is on point on. To answer your question, is the Abbott versus Amoco Oil case, a second district case, where the court held that as we previously stated, an unambiguous contract must be enforced as it is written. Furthermore, a court may not add provisions to an unambiguous contract even if these make the contract more equitable. Likewise, the LaSalle National versus Village of Westmont, another second district case from 1994, states that an unambiguous contract must be enforced as written. When an agreement is not ambiguous, the intention of the parties to the agreement must be determined from the instrument itself. The court will not add another term about which an agreement is silent, such as the word material here, Justice Brennan, and no word should be added to or taken from the agreement to change the plain meaning of the parties as expressed therein. Counsel, did your clients request money damages? No. So this was not an action of law? This was an action in equity or in chancer? Well, it was brought in chance. We were not the plaintiff in the case, Your Honor. What happened was my clients exercised their right to terminate under the agreement. They recorded that termination as required under the contract with the King County Recorder of Deeds, and then Symphony, for the first time, truly engaged by doing what? By filing a lawsuit seeking to have the court declare the termination, a declaratory judgment, to declare the termination invalid. That's why we were in front of the circuit court judge that we were. So with a declaratory judgment, the question is whether or not the findings of fact are against the manifest weight of the evidence, and based upon the findings of fact, whether or not the trial court abused its discretion in granting the relief that was requested in the declaratory judgment, which would have been equitable relief rather than money damages. Your Honor, the circuit court's role was to apply the unambiguous terms of the party's written contract as written. The role of the circuit court in this case was to apply the language as written and to apply that language as written to what are essentially completely undisputed facts, and not to use a cloak of equity to do precisely what the Illinois Court of Appeals has told circuit court judges it cannot do. Again, to the Abbott case, you can't rewrite a contract, even if the court thinks it would result in a more equitable outcome. With respect to the materiality issue, does it matter that it appears, based on your discussion this morning, that your client, your client treated these would-be breaches as only actionable, that is, a letter, when they were material breaches? In other words, it wasn't one box laid or lined up on the easement, but it was multiple boxes and materials and machinery. Absolutely. Does it matter, or it does matter? Well, if it matters, it was present here in this case. But ultimately, any means any. The parties knew what they were doing when they wrote any breach into the agreement and omitted the word material solely for the purposes of triggering and exercising the right of termination. But that being said, Your Honor, you raise a fine point. There's a – here on the undisputed facts, the materiality of these breaches and the evidence of materiality exists in spades. For instance, yet another ground – Justice McLauren, I didn't want to – I thought I saw that you were about to ask something or say something. I was going to write a little note telling the presiding judge that his time is up. Right. We're going to give you an opportunity, Mr. Hudson, to speak at a future point. So we'll ask you to resume your place at the council table. Mr. Karyakis. Thank you, Your Honor. Good morning to the court. May it please the court, counsel, and the parties. A lot of the questions the court has already asked are the questions I think that Judge Bush asked that made him rule the way he did. Counsel is essentially talking about the termination provisions that were to ignore basic tenet of contract law. That is that a breach must be material. He didn't cite to you a case, nor is there a case that says that a breach that's going to terminate a right such as an easement – and again, this is a land right, this is an important right – needn't be material. And the termination provision effectively – this isn't the world's greatest written document, and I think if we had it been written better, maybe we wouldn't be here today. It is absurd to argue that an important land right that has existed for over 30 years can be terminated by the grantor at the stroke of a pen without a court to oversee that it's a proper termination, without a court to look at whether on a fact basis there's a material breach that has occurred. And the absurdity of it is seen in what happened in this case. We were literally at trial on whether this easement had been terminated, and United States property filed another document purporting to terminate it. Effectively, the trial was a circus at that point in time because what we were doing didn't matter. Under the contract, if interpreted as United States property would ask you to interpret it – more appropriate would be to file a summary judgment motion early on saying that we win because the contract says we win. We don't need the court. An affirmative defense could have perhaps also addressed that, but once we were at trial, the court had to make maybe a counterclaim. Well, they filed a counterclaim arguing that they were terminated, and so at that point it's sort of inconsistent with their argument here. They were asking the court to find a termination that had existed while very carefully crafting their counterclaim to say they didn't need the court. Well, it's an additional claim to what they supposedly iterated before. Oh, the newest thing. I'm sorry. I misunderstood, Your Honor. Certainly, I suppose perhaps given the timing they didn't do it because we were set for trial and perhaps Judge Bush would have had a concern about a late filing like that, but certainly if they were going to try to terminate based on that, they should have filed at least a counterclaim or brought it to the court's attention. It was, I think, frankly shocking to the court and to myself and my clients that effectively we were being told that what we were doing at trial didn't really matter because even if the court found that a termination hadn't properly occurred, they had the right to, without dealing with whether it was a breach that was material or not. The point is that prior acts are not dependent on future acts, and neither are future acts necessarily dependent on prior acts. So theoretically there's nothing wrong with filing an additional termination if in fact you started drilling for oil. I suppose, but I think where I would argue perhaps where this comes into play more is in terms of the criticism of Judge Bush in enacting a protocol now for the future as to what's to occur in this case. And he's being accused or criticized for rewriting the contract. I think the court in interpreting the contract, and again, as Your Honor previously noted, this is a court of equity. This is not a court of law. We are in the chance report where we're trying to reach a good result. I think he interpreted the contract to require court approval in the future. Am I wrong in thinking that prior case law indicated that if there was an extraordinary or oppressive use of an easement, that the appropriate remedy is not necessarily termination, but an injunction enjoining such activity? Well, that certainly could have been sought. It wasn't sought by United States property in this case. Well, that's partly because the contract said that they could do it based upon a breach. Again, the contract... the court to establish whether there was a breach or not a breach, and whether it was material or not material, and whether or not equity would entitle them to have it terminated, and all emoluments of your rights as the dominant estate would be terminated. All true. I mean, we actually went to court initially because they were breaching the contract and erecting a gate that was blocking the curb cut, which started the process. So their breach resulted in us going to court and resulted in their... How could the agreement not take into account that issue? Well, I think it's clear that either it's inferred that the curb cut uses allowed because it occurred all along anyways, or in the alternative that the trial court's correct in finding that prescriptive easement was provided. I think, in fact, United States property doesn't seem to argue very vigorously that the curb cut use is inappropriate. It has to be used. I believe this easement was created in part based upon the fact that there was a swap of property. Yes, effectively. My clients owned the property in question. There was a swap, and they needed to be able to get to the specific door. I mean, this entire litigation is about getting to that door is what it really comes down to. So is it correct to presume or conclude that the curb cut was used during the time that your client or some predecessor owned the property in question? Yes, as far as I know, there's no reason to believe that the curb cut was not always used. And the agreement was supposed to embody that? One would think... Well, I certainly read nothing in the language that intends to limit access over the curb cut. It's an omission, and that's where the ambiguity exists, I believe. And I think on that score, the court correctly found an ambiguity and did a common-sense application. And, again, either the use of the curb cut is inferred by the ambiguity and the court properly determined what was allowable or, in the alternative, I think we certainly established a prescriptive easement based on the evidence of trial. One of the issues in this case is that... Why would it be a prescriptive easement unless there was no other access to the property? Well, I think the prescriptive easement we, I believe, established was an easement from the curb cut area to the easement itself. So that creates the access to the easement. So if you're not going to find that it's inferred that we're entitled to go over the curb cut to get to the easement, what other right do we have to get there but through the use of a prescriptive easement, I believe. And I think that that's one of the things that's interesting in this case, is every contract may have few ambiguities, no ambiguities, but I don't think that the trial court here made a blanket, there's an ambiguity so I can do whatever I want type thing. The trial court looked at things and determined whether it was or it was not an ambiguity and, I believe, made the correct rulings. U.S. property, in some instances, frankly, argues that there's no ambiguities whatsoever in this contract and yet, in some instances, asked the court to extend the contract. For example, permitted users is something that comes up and that comes up in the context of people that were walking on the property to go do sometimes unsavory things, take pictures or whatever. This is an easement for ingress and egress. So what's that for, to walk over the property and get to the door? Was the property that was supposed to be an ADA nonconforming use on your property or on their property? Well, certainly when the easement was written, the ADA didn't even exist, so I don't know if anybody thought about that. I'm not sure you're answering my question. Okay, so was the property... Was the door that they were complaining about on your property or their property? The door was on our property. And I think in relation to the ADA evidence, the judge made the correct ruling because if our ADA door didn't comply, that was our problem, it wasn't the easement's problem. I don't see why there would be, and I think Judge Bush agreed, any relevance to whether that door, you know, if the interior was the wrong pitch or didn't work right or whatever. I would also note on the ADA issue, as we wrote in our brief, there's no evidence that the city of Elgin or the county of Kane or any other enforcement agency was of the opinion that this door was in violation in any way and required some remediation or whatever. But the user's issue is a good example of a scenario where U.S. property kind of trips over its own feet in its arguments because there's no definition of what a permitted user is in the easement. But if you give the two words their ordinary meaning, permitted user means what are they doing? They're walking on the property to access the door. That's what the easement's for. It's for access to the door. U.S. property wants to read into the easement that permitted user means anybody that is at our property for any reason whatsoever, not using the easement for ingress and egress purposes, but just because they're there. And they're reading into it an ambiguity that I don't think exists. I mean, I think the court in that scenario probably found there wasn't an ambiguity. When the word permitted user is included in the contract, what we're talking about is people using the easement for its intended use. That makes sense. And so the courts criticized, the trial courts criticized for that determination, yet there is, again, there's no language in the contract that says that other people accessing the building by other entrances or whatever else are somehow now permitted users of the easement. On the flip side, on the issue regarding the traffic and the blocking and so forth, as we argue in our brief, the easement itself explicitly allows vehicles to use it. The nature of a vehicle is that if a vehicle drives on the easement, it by definition is going to block a portion of the easement, and the easement explicitly prevents blocking. It doesn't say what blocking means in terms of length of time, size of vehicle, size of whatever, and unless the vehicles are going to levitate themselves somehow, there is an inconsistency there. You're allowing us to have service vehicles access that door, yet one of the complaints of the U.S. property was frequently that the vehicles were supposedly blocking their access to the easement. There's an inconsistency there, and there's an ambiguity there. And again, on that issue, what the trial court did is it did what it had to do and try to interpret the easement in terms that made sense, that were applicable to actual reality and the facts. And frankly, our position was we proved that over the course of 20-plus years, we had parked there and perhaps had created a prescriptive easement, but the trial court didn't agree with us in that regard and in fact limited our future use to basically temporary uses only. Again, a common-sense application of what the facts are to try to create a reading of the easement that makes sense. Another termination basis is the HVAC system. And again, in answer to your prior questions, Your Honor, HVAC system is completely silent on the easement, and yet it clearly existed there. I mean, we owned the land when the swap occurred, and then after the swap occurred, you've got this HVAC system that's clearly now our adjacent property on somebody else's land. The easement writer didn't even address that system. There's nothing in the document that says that it's being allowed or it should be removed or whatever. Was the air conditioning unit on the right-of-way or the easement way prior to the swap? Yes, it was there, and not only the air conditioning unit, but there's a cement-like walkway with a rail, and I would call this. And did the document make any mention whatsoever about the air conditioning unit? None. So there again, another ambiguity based on silence. Clearly at this point, we're not the owners of this property anymore, and yet our property is permanently affixed to it. There's no discussion whatsoever in the easement about that unit being moved, about being allowed or whatever, and what the court made a determination was is that it's inferred that it's allowed, which again makes sense based on the facts of this case. If I can ask a related question. If we were to, and I realize this is going to be argued a little later, but as to the judge's determination that no longer could someone just file a termination with the recorder, instead they have to come into court and get the court's permission to terminate, if the prevailing party clause of the agreement was to be interpreted the way that you want it to be interpreted, isn't that really the safety valve for an improper termination? I mean, if USP knows that if every time they terminate or do something like that, if the court's going to find that they were improper in doing so, they'll have to pay the attorney's fees, wouldn't that solve the problem? Why does the court have to engage in this rewriting of the contract as it relates to termination? Well, I think the way I would answer that is I think the court's still trying to do justice and equity in its decision. As an attorney being paid to be here to litigate this case through a trial and then here, perhaps I should welcome that interpretation because I'd be back in court again and again and again. I mean, one of the things that occurs in this case and counsel talked about is how they've acted in good faith. We certainly take the opposite position. Within a month of being the owners, we already had, I think, four, five, six terminations letters for a variety of reasons. But in answer to your question, Judge, if that's where we were, then we'd be here again and again and again. Basically, what we would have to do is react. They would file a termination letter, and now our easement's being clouded, and we'd have to file yet another lawsuit to undo it and perhaps get legal fees and so forth. At some point in time, perhaps they would learn their lesson, I guess, and so that would be a good thing. But I don't think it's a good thing for me as an advocate for my clients to suggest that that's the outcome. And I do think that the trial court, again, in using common sense and trying to create a document that makes sense under the law, is entitled to interpret it so we don't reach an absurd result. And I think it would be absurd to have to come to court again and again and again to undo that act. So I don't know if that answers the question. Another scenario of the absurdity of some of the positions they take is the testimony in the trial about the movement of the easement. There's language in this easement that basically the whim of the grantor of the easement can be relocated. And we have Dory, one of my clients, out basically shoveling snow one day and being told, no, I've moved the easement over there today. And so I guess in the U.S. property's interpretation of how that term should apply, they could come out and move it every day if they wanted to. We could put up cones and say that the easement's over there today and tomorrow it's over here and so forth. Again, an absurd result. The trial court certainly, as a court of equity, has the ability to interpret terms and address terms and modify terms to the extent necessary to make them compliant with Illinois law. In terms of all the stated termination claims or reasons in the initial arguments, there was some touching on the insurance issue. Number one, it was stipulated at trial that the time frame based on the counterclaim that was relevant was December 2017 forward. There's no evidence in this case that insurance was not in place at all times from that time forward. It was stipulated to. The material issue here, and as the trial court correctly noted, is were they insured, and they were at all times. There's the case law that was cited which basically suggests that a way to look at material is if you knew about that breach at the point in time you were entering into the contract, would you have never entered into the contract to begin with? What's the necessity here? The necessity is a landowner, you want your insurance in place. It was in place. I can't undo the fact that there was a glitch of a few days, and yet again, is that a material breach that would warrant termination altogether of an easement because for two, three days notice wasn't given? It is what it is. The facts are undisputed there. I respectfully would suggest to the court that that's simply not a material breach. Does the record reflect who formulated the easement agreement? I don't believe it does, and I don't want to mistake that, but I believe at the time the easement was written we had a scenario that was quite a bit more friendly than it is today, and so I wouldn't be—I mean, I know the attorney that did it. I can't speak as to which side he worked for. I think I touched on the ADA issues. The issues of a prescriptive easement, 20 years adverse use, one of the things that U.S. property frequently argued was a neighborly scenario. All I would suggest to the court there is by definition, because use has to be open and notorious, if you're a neighbor you by definition see it, and if you keep your mouth shut for 20 years you're by definition being somewhat neighborly. It doesn't eliminate the creation of a prescriptive easement in a scenario just because you stay silent. Basically on that issue in terms of suggestions that there was some agreement or ceding to the use of the easement, literally the one piece of evidence that U.S. property provided was that the prior owner, subsequent to the initial owner, but between the initial owner and U.S. property, on one day as a vehicle drove in that she didn't even know who the driver of was, she waved at them and didn't even talk to them, and that's in 30 years worth of going over the curb cut and parking and doing all the things that were established, the one thing they showed that they I guess supposedly intended to show that there was an agreement in place. There's absolutely no evidence whatsoever in the record that there was an agreement, there was no calling of the initial owners to say that they, and I will with that, I think I'm out of time. Are there any questions? Any questions? No. I have no additional questions. Thank you. Thank you. Mr. Perianos, you'll have an additional opportunity. Thank you. Mr. Hudson. One second. Thank you, Your Honors. May it please the Court. I'd like to hit on a couple of points here. First, U.S. property did file a summary judgment brief. We lost. And we also had a counterclaim in this matter for breach that we asserted for the breaches that are at issue in this case. Mr. Perianos misspoke. He said that permitted users is not defined, that somehow that's an unambiguous or undefined term in the contract. That's false. Section 2C, under definitions of the written contract, expressly defines grantees, permitted users, shall mean symphonies, employees, agents, servants, invitees, visitors, licensees, concessionaires, customers, and tenants. So who's excluded? Pardon me? So who is excluded? Who is excluded from their invited? Well, they're permitted users. A random person walking down the street, perhaps, that walks onto the easement or comes onto the property. So whose responsibility would it be to eject that person? Someone who is not a permitted user. If they're a permitted user, the responsibility falls squarely on symphony. A stranger just walks along. I would say that the owners of the property, the owner of the property, U.S. property, would have a right. Bless you, Justice. An obligation, then. Well, I don't know if anyone has an obligation to eject someone from their property if they choose not to do so. But I would say that both symphony, given its property interest in the easement while the easement was still in existence, would have a well-founded basis to call the police across the street and say, Hey, listen, we've got somebody sleeping in the easement. We don't know who this person is. Interpretation of the section relative to people who urinate or vomit on the easement. Oh, well, that's clear, and there is no dispute about that. Those folks were all guests at symphony's parties. I'm sorry, I didn't get you. They all what? Were guests, invited guests and visitors and customers at the parties at symphony way. This was a largely abandoned building or a very quiet building for decades until they started this new party business called The Hate. Over the course of a handful of years, the visitors increased to over 30,000 visitors to that property a year. For parties that occur almost every other day, 95 percent of which have alcohol served. There was no dispute at trial. It is stipulated to and admitted to that all of the videos, all of the pictures that were taken of people urinating and vomiting were invited guests, permitted users of symphony 100 percent of the time. Are you saying that no one who urinated or vomited just happened to be walking down the street? Not in this case. Did that potentially happen at some point in time? Maybe, but that's not an issue in this case. What we know for an absolute metaphysical fact is that those who were using the easement and our adjoining private property as a toilet, as a bathroom, 100 percent of the times came from their property. Does the frequency of that conduct, is the frequency of it relevant or is one time happening a breach and termination is allowed? Well, it theoretically is one time a breach. Under the plain language of the contract, their permitted users cannot use the easement in a manner that violates a law or ordinance, public intoxication or public urination. And they can't use it in a manner that harms the reputation of the easement or U.S. properties adjacent poverty. What do you mean reputation? Reputation, I agree, can be a questionable term, but here the reputation of the property is, is your property known to be a place where people can go and relieve themselves after leaving a bar? Clearly, that would negatively harm the reputation of the property. But more importantly, it's a plain violation of the city's law and ordinances. Indeed, the circuit court even found as much in this case. But Justice Brennan, back to your point, this is not an instance of a, this is not a case of a single instance. It's happened time after time after time for years, years. There are a series of written notices saying here are more videos, here are more instances with dates and times of your guests using the easement as an extension of your party space. It can be used for ingress and egress for driveway purposes only. But let's assume U.S. or UPS tells these people this. You can't urinate, you can't, well, you probably wouldn't tell them, you can't bother. Let's just stick with urination. You can't urinate out here, don't urinate out here. And everybody knows it's illegal to urinate outside. But isn't U.S.B. at some level entitled to presume that its guests will follow the law? And are they responsible when their guests do not follow the law? Yeah, they are responsible when their guests do not. Here, Your Honor, the allocation of that risk and that burden is clear. Symphony chooses to use its property in a way that threatens the use of its continued right to use the easement because they're bringing in tens of thousands of party guests to drink every other night. And if they can't keep those guests off the easement, then they have a decision to make, right, as a party to a contract. Is it more important to us to have, to run this business in the way in which we're running it, even if it means we lose this easement? Does that then mean that they have the authority to put a gate up to keep their permitted users, as you call them, off the premises? I don't think there would have been an objection to that at all or to simply hire a security person to stand out there. Spend a little money to make sure that your security person stands there and shoes people away. That's an easy fix, but that costs money they weren't willing to spend. And as they themselves admitted, they just didn't take it seriously until after U.S. Property Clause termination. Hire a security guard and then send the bill to THC? Well, the contract doesn't contemplate that. And if THC decides, and if the hate company decides not to pay that bill, then we come in and have another lawsuit, and there's no contractual provision that covers that because the restriction is a one-way street. It is clear and unambiguous that these restrictions on the use of the easement agreement rest exclusively with Symphony. It is explicitly and expressly what that section says. These are not joint obligations, the obligation not to use the easement in such a way. It says that the grantee shall only use it for purposes incidental to the driveway easement and neither grantee nor its permitted users, not the parties, Symphony and its permitted users shall make no use of the parcel in such a way to do precisely what they were doing over and over and over again. After notice, after notice, after notice. It never stopped. It never stopped. And these breaches were material. For instance, with respect to the insurance provision, it's well settled under Illinois law that, quote, when performance of a duty under a contract is due, any nonperformance is a breach. That's the restatement second of contracts, which Illinois follows. And here the undisputed, unrebutted record evidence overwhelmingly demonstrates that the insurance requirement was an important material term of the agreement. To begin with, the party specifically provided for this affirmative requirement in writing. It was important enough to put it in there. The curb cut wasn't put in, but this was. In addition, as Symphony's use of the property and the burden on the easement became greater and greater and greater, far beyond anything that was ever anticipated by the parties. What's your basis for that? Pardon me? What is your basis for that? The basis for that is the historical use of the building. It was not a public event space. It had only been used as subdivided offices or an art gallery. There's a flower shop. The evidence record went through how the building had been used from day one. Are you telling us that the building is being used in violation of its zoning? No. We're not saying it's violating its zoning. We're simply saying that the use of the building and the burden that new use placed on the easement changed dramatically beginning in 2014. Any additional questions for Mr. Hudson? No. I do not. Mr. Hudson, thank you very much. Thank you, Your Honors. Mr. Curry. This is my rebuttal on the cost appeal only, and I don't really have anything to rebut because it hasn't been really argued at all. I don't know if I take that as I think USP effectively knows that if the court affirms the underlying case that the fees probably should have been awarded. But all I'll say is we briefed our positions on the cost appeal. The indemnification clause here did not indemnify the grantor for its own wrongdoing. The case law very clearly says that that's disfavored by the courts but can be applied if the parties explicitly agree to that. The parties here did not explicitly agree to that. The conduct that really led to this lawsuit was initially the erection of the gate that blocked our easement, which caused us to have to file an action to get back the use of our easement. I think Judge Bush made very specific findings regarding the misconduct and inappropriate conduct of USP. Why he decided to then not impose fees when the contract required them is a little unclear to me, but I think that while his decisions were sound on all other issues respectfully, I think his decisions relative to the fees were unsound and in error. What this court ought to do in our opinion is send this case back on that issue only and allow my client to establish what reasonable fees were, allow the trial court to determine what should be awarded. One final note there. He, being Judge Bush, also made a finding effectively that it would offset their fees based on what our fees might have been as against their fees. I'm not quite sure what that rationale was. Did the trial court find that you were the prevailing party? Yes, the trial court did find that we were the prevailing party. But it said that the indemnification clause canceled out the fees back and forth? Effectively. It also said as a court of equity that our fees would cancel their fees out, and that's where I think there's an error there. How do we know whether our fees were the same as their fees? That's a factual issue that you're making an assumption that the fees are identical, which I don't think is an accurate assumption. But in answering your question, yes. I think the trial court very explicitly found we were the prevailing party and then canceled it out. Mr. Hudson claims or argues that the clause describes urinators and vomitors as permitted users. Do you agree with that? I do not agree with that. I think a permitted user by definition means somebody that's using the easement for its intended purpose. There's not one video. Are you arguing that the intended use is ingress and egress across the property, the subsurface of the estate, and urination and vomiting is not anywhere close to related to egress and ingress? Well, two things. Number one, of course that's not related to egress and egress. But if there was evidence of people using the property, so if Grandma with her walker and her kid getting to the ADA door, stopping to urinate, then she's at least a person using the easement to get to the door. And if she stops and does that, then I suppose a breach may have occurred. There is not one video that they showed of a person actually accessing that door, doing any of the things they complain about, or a person coming out of that door to get out. It's always people coming out from the side. Now, may some of those people have been our guests? Unfortunately, yes. But they weren't using the easement for its intended purpose. And I think that's where U.S. Property and my clients have always disagreed on that term, and I do believe the Court made the correct decision in interpreting what that term means. It applies to people using the ingress-egress aspect of the property. I don't have any further comments on my cross-appeal. Again, there's nothing to rebut because it hasn't really been argued, so unless the Court has any further questions. Thank you. Thank you. The Court would like to thank both parties. I think he has the right to rebut anything he says. No. No? The Court would like to thank both parties. Well, I'm sure you would like to take up that invitation, but I marshal that that is not correct. Okay. So the Court would like to thank both sides for spirited arguments. The Court is going to take the matter under advisement and render a decision in due course.